UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                                                          Chapter 11

NEW YORK CRANE & EQUIPMENT
CORP., *et al.*,                                                Case No.

                                        Debtors.[1]
------------------------------------------------------------x

## CONSOLIDATED DECLARATION OF JAMES F. LOMMA
## PURSUANT TO LOCAL BANKRUPTCY RULE 1007-4

     James F. Lomma declares the following under penalties of perjury pursuant to 28

U.S.C. §1967:

     1.     I am the president of the three corporate Chapter 11 debtors herein, New York

Crane & Equipment Corp. ("New York Crane"), J.F. Lomma, Inc. (DE) and J.F. Lomma, Inc.

(NJ), as well as the individual Chapter 11 debtor (collectively, the "Debtors").  I respectfully

submit this Consolidated Declaration in support of the Debtors' respective Chapter 11 filings in

accordance with the Local Rules of this Court.

     2.     Contemporaneously herewith, the respective Debtors are moving to have their

cases jointly administered for procedural purposes.  This Declaration is being filed for all of the

Debtors and reflects the proposed joint caption for the related bankruptcy proceedings.

     3.     The purpose of this Declaration is to provide pertinent information regarding the

circumstances prompting the Chapter 11 filings, the Debtors' respective businesses, assets, and

capital structure, and the Debtors' strategies for reorganization.

---

[1] The Debtors in these Chapter 11 cases are as follows: New York Crane & Equipment Corp.,
J.F. Lomma, Inc. (NJ) ("Trucking"), J.F. Lomma, Inc. (DE) ("Rigging") and James F. Lomma.  The Debtors intend
to file a motion pursuant to Fed. R. Bank. P. 1015(b) for entry of an order directing joint administration of these
related Chapter 11 cases.

## Salient Events Leading up to the Chapter 11 Filings

4.      The decision to seek Chapter 11 relief is certainly not an easy one.  However, recent events have left the Debtors no viable alternative if they hope to continue active business operations and preserve the going concern value of their assets while the Debtors pursue an appeal from certain adverse judgments entered in the Supreme Court, New York County on January 5, 2016.

5.      The judgments followed a highly-publicized civil trial in which two wrongful death claimants were awarded verdicts totaling $96 million for compensatory and punitive damages (subject to certain credits and offsets) emanating out of the 91st Street crane collapse litigation (Index No. 771000/2010).

6.      Historically, the Debtors have operated successful crane, trucking and rigging companies doing business in New York City and other parts of the country, enjoying a fine reputation in the construction industry.  Indeed, the Debtors have provided equipment and services in connection with many significant development projects over the years, including current projects being serviced by New York Crane at the Hudson Yards, the re-development of the World Trade Center, and replacement of the Kosciuszko Bridge in Brooklyn.

7.      On May 30, 2008, a Kodiak tower crane owned by New York Crane, and leased to a concrete subcontractor known as Sorbara Construction Corporation ("Sorbara") collapsed while in use at a construction site at 333 East 91st Street in New York City.  The crane operator employed by Sorbara, Donald Leo, and another construction worker, Ramadan Kurtaj, died in the accident.  The accident was widely chronicled and led to a number of investigations, including a criminal indictment by the New York District Attorney.

8.    The investigation focused on whether the crane collapse was caused by a defective weld performed by an overseas company engaged by New York Crane to attach the crane apparatus (the boom) to the turntable and base of the crane. I was charged criminally because New York Crane allegedly hired an inexperienced company to perform the weld replacement, although the crane was tested by engineering firms before it was put back into service.

9.    On April 26, 2012, I was fully acquitted of all criminal charges after presenting substantial evidence and expert testimony indicating that the crane collapse was the result of operator error combined with the disengagement of safety devices by the operating crew at the construction site.

10.    In essence, because various safety devices for the crane were disengaged by employees of Sorbara, there was no means to prevent the crane from operating after the boom was raised to a dangerous angle nor to prevent the iron ball above the load line hook (the headache ball) from being raised into the tip of the boom. As a result, the welds holding the boom broke apart and the crane collapsed backwards, falling onto the adjoining property.

11.    While the Debtors' defenses were vindicated during the criminal trial, they still faced a plethora of civil lawsuits. The two most significant lawsuits involved wrongful death actions brought by the respective estates of Donald Leo and Ramadan Kurtaj. These plaintiffs continued to claim that the collapse was caused by a defective weld installed by the overseas company. The Debtors were sued under alternate tort theories including negligence and recklessness in connection with the repair and replacement of the weld.

12.    After a ten month civil trial, a jury found in favor of the respective estates of Donald Leo and Ramadan Kurtaj, awarding 48 million dollars in total compensatory damages

and 48 million dollars in punitive damages on August 3, 2015. Liability was apportioned 61% against me personally, 19% against New York Crane and 20% against J.F. Lomma, Inc. without specifying any apportionment as between the Trucking and Rigging companies.

13.     The Debtors' attorneys believe there are substantial grounds to appeal and reverse the verdict. Indeed, much of the expert reports and evidence admitted during the criminal trial was not admitted in the civil trial. These preclusive rulings denied the Debtors the meaningful opportunity to present evidence in support of the Debtors' defense that the collapse was attributable to a combination of operator error and erection crew error when the limit switches were disengaged. This disengagement led to an ensuing "two blocking" condition (i.e., raising the crane's headache ball above the hook into the tip of the boom of the tower crane). When the boom is raised at a steep angle, the two blocking condition will cause the crane to collapse regardless of the strength of the weld.

14.     Important evidence exists that supports the Debtors' contention that the weld was sufficiently sound and broke apart by virtue of the crane falling backwards following operator and erection crew error. In sum, the Debtors were denied the opportunity to present any evidence of alternate causation for the incident, i.e., operator and erection crew error during the civil trial, in stark contrast to the same type of evidence allowed and presented during the criminal trial.

15.     The Debtors intend to vigorously pursue their appellate rights and have already prepared and filed notices of appeal which they intend to perfect with the Appellate Division as quickly as possible. In view of the erroneous rulings by the trial court in preventing the Debtors' experts from testifying, excluding the introduction of evidence based on exceptions to the hearsay rule, permitting the award of punitive damages, permitting an erroneous ruling against

4

J.F. Lomma, Inc. (Delaware), even though it was not a party, the Debtors believe that there are strong grounds for the verdicts to be reversed in their entirety and a re-trial ordered. Moreover, since the compensatory verdicts far exceed what has been sustained by the Appellate Division for similar circumstances, there are also good grounds to obtain a reduction in the compensatory verdicts on appeal and the elimination of punitive damages.

16.     In the interim, the Debtors are seeking Chapter 11 relief to prevent a premature dismantling of the companies until full appellate review is concluded. The Debtors intend to move shortly for relief from the automatic to continue with the appellate process. It is expected that the appeal can be concluded within a period of nine months. During this time, the Debtors intend to continue operating in the normal course of business and can sustain profitable operations.

17.     The costs of the appeal are covered by the Debtors' excess general liability insurers, Lexington Insurance Company and/or Zurich Insurance Company, which are paying the legal fees for Wilson Elser, the Debtors' trial counsel and co-proposed special appellate counsel. I also personally retained the services of Nathaniel Z. Marmur, an experienced appellate attorney to work on the appeal as well.

### The Debtors' Businesses

18.     New York Crane is a New York corporation organized in 1993 which is engaged in the business of renting unmanned cranes in New York City. I am the sole shareholder of New York Crane which employs a total workforce of 17 people.

19.     New York Crane's main yard is located in Maspeth, Queens, where its inventory of cranes is stored. A full set of schedules is being filed with the respective petition listing all assets and liabilities of New York Crane. New York Crane was the lead defendant in the 91st

Street crane litigation, as well as a defendant in the 51st Street crane litigation, which involved another tower crane involved in an accident at 303 East 51st Street on March 15, 2008. The 51st Street accident was caused by improper rigging of collars under the supervision of a third-party master rigger. New York Crane is one of many defendants in the lawsuit but most of the focus is on claims against the master rigger, who was an employee of the subcontractor involved in the project. In the last fiscal year ending August 31, 2015, New York Crane generated total sales income of $17,895,234.

20.    J.F. Lomma, Inc. (Trucking) is a New Jersey corporation organized in 1973 which is engaged in the interstate trucking business. I am the sole shareholder of J.F. Lomma, Inc. (Trucking) which employs a total workforce of 75 people. A full set of schedules is being filed with the respective petition listing all assets and liabilities of J.F. Lomma, Inc. (Trucking). In the last fiscal year ending August 31, 2015, J.F. Lomma, Inc. (Trucking) generated total income of $5,645,818.

21.    J.F. Lomma, Inc. (Rigging) is a Delaware corporation organized in 1989 which rents cranes outside the City of New York. I am the sole shareholder of J.F. Lomma, Inc. (Rigging) which employs a total workforce of 37 people. A full set of schedules is being filed with the respective petition listing all assets and liabilities of J.F. Lomma, Inc. (Rigging). In the last fiscal year ending August 31, 2015, J.F. Lomma, Inc. (Rigging) generated total income of $24,929,282.

22.    I personally reside in Staten Island and serve as president and 100% shareholder of the respective corporate Debtors. I also have interests in other businesses and real estate companies, primarily with my long-time partner, Frank Kearney, and one of my daughters. A list of all of my assets and income is attached to my personal Chapter 11 petition.

### The Reorganization Strategy

23.    The overall reorganization strategy is to maintain active business and going concern values and diligently pursue favorable results in the Appellate Division. The Debtors collectively employ more than 129 people and are integral to a number of active construction projects. Accordingly, any piecemeal and premature liquidation of the companies would have severe repercussions for third parties.

### Local Rule 1007 Disclosures

24.    Pursuant to Local Rule 1007-4(a)(iii-iv), no committees were formed prior to the filing of the Debtors' respective Petitions.

25.    Pursuant to Local Rule 1007-4(a)(v), a list of the names and addresses of the creditors holding the 20 largest unsecured claims against each of the respective Debtors is attached to the respective Petitions.

26.    I have certain outstanding personal mortgage debt as listed in my personal bankruptcy Schedules. The corporate Debtors have no secured creditors and no mortgage or lien debt.

27.    Pursuant to Local Rule 1007-4(a)(vii), a summary of the assets and liabilities of each Debtor is set forth in the respective Schedules.

28.    Pursuant to Local Rule 1007-4(a)(viii), I am the sole equity holder of each of the corporate Debtors.

29.    Pursuant to Local Rule 1007-4(a)(ix), none of the Debtor's respective properties or assets are in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor.

30.    Pursuant to Local Rule 1007-4(a)(x), the Debtors' interests in real property are reflected in the respective Schedules.

31.    Pursuant to Local Rule 1007-4(a)(xi), the Debtors' respective assets are located primarily in Maspeth, Queens and South Kearney, New Jersey.

32.    Pursuant to Local Rule 1007-4(a)(xii), a list of all pending lawsuits is attached to the Petitions.

33.    Pursuant to Local Rule 1007-4(a)(xiii), I am the president of the Debtors and earn a yearly salary of $161,494 paid by J.F. Lomma, Inc. (Trucking).

34.    Pursuant to Local Rule 1007-4(a)(xix-xvi), a 30-day budget for each of the corporate Debtors is attached hereto as Exhibits 1, 2 and 3.

Dated: January 6, 2016

JAMES F. LOMMA

X:\GWFG\new data\Yen\word\Lomma, James\Joint Local Rule Affidavit - 1-5-16.docx

8

Schedule 1

| J.F. LOMMA, INC. (NJ) | |
|---|---|
| Estimate | |
| | |
| | |
| | |
| | |
| REVENUE | 164,532 |
| | - |
| Salaries and Wages | 116,353 |
| | - |
| Fringe Benefits | 39,190 |
| | - |
| Operating Expenses | 49,225 |
| | - |
| General and Admin Expenses | 15,466 |
| | - |
| Operating Taxes | 20,246 |
| | - |
| Insurance | 30,115 |
| | - |
| Communication & Utilities | 5,617 |
| | - |
| Equipment Rentals | 7,500 |
| | - |
| Office and Eq. Rentals | 30,157 |
| | - |
| Misc Expenses | 2,920 |
| | - |
| TOTAL OPERATING EXP. | 316,789 |
| | - |
| OPERATING INCOME | (152,257) |

Schedule 2

| NY Crane | |
|---|---:|
| | |
| | |
| | |
| REVENUE | 1,667,650 |
| Salaries and Wages | 314,522 |
| Fringe Benefits | 92,250 |
| Operating Expenses | 161,854 |
| General and Administration Expenses | 13,149 |
| Operating Taxes | 40,357 |
| Insurance | 53,666 |
| Communication and Utilities | 5,727 |
| Depreciation | 42,036 |
| Equipment Rentals | 627,235 |
| Office and Office Eq Rental | 67,674 |
| Misc Expenses | 22,713 |
| TOTAL OPERATING EXP. | 1,441,183 |
| INCOME BEFORE TAXES | 226,467 |

Schedule 3

| J.F. Lomma Inc. (Delaware) | |
|---|---:|
| REVENUE | 2,054,066 |
| Salaries and Wages | 377,832 |
| Fringe Benefits | 137,157 |
| Operating Expenses | 295,659 |
| General & Admin Expenses | 39,825 |
| Operating Taxes | 15,899 |
| Insurance | 60,608 |
| Communication & Utilities | 9,327 |
| Equipment Rentals | 857,454 |
| Office and Eq. Rental | 27,460 |
| Misc Expenses | 10,345 |
| TOTAL OPERATING EXP. | 1,831,565 |
| INCOME BEFORE TAXES | 222,501 |